**FREEDOM FROM RELIGION FOUN-DATION, INC., and Clarence Reinders, Plaintiffs–Appellants,**

v.

**CITY OF MARSHFIELD, WISCONSIN and Henry Praschak Memorial Fund, Inc., Defendants–Appellees.**

No. 99–1639.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1999.

Decided Feb. 4, 2000.

As Amended on Denial of Rehearing and Rehearing En Banc March 20, 2000.

David E. Lasker (argued), Madison, WI, for Plaintiffs-Appellants.

Dennis A. Juncer, Stauber, Juncer & Wolfgram, Marshfield, WI, Francis J. Manion (argued), American Center for Law & Justice, New Hope, KY, for Defendant-Appellee City of Marshfield, Wisconsin.

Francis J. Manion American Center for Law & Justice, New Hope, KY, Mathew D. Staver, Liberty Counsel, Longwood, FL, for Defendant-Appellee Henry Praschak Memorial Fund, Inc.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In 1959, the City of Marshfield, Wisconsin ("City"), accepted a gift of a statue of Jesus Christ from the John Eisen Assembly, Fourth Degree Knights of Columbus. The City placed the statue in what was then known as Wildwood Park—undeveloped property owned by the City.

The white marble statue rises fifteen feet in height. It depicts Christ, arms open in prayer, standing atop a large sphere, which in turn rests atop a base bearing the inscription in twelve-inch block letters, "Christ Guide Us On Our Way." *See* Figures A & B appended to this opinion, *infra.* The statue faces State Highway 13 (Roddis Ave.), the main thoroughfare into Marshfield from the south, and is clearly visible to travelers from the road. In 1964, Henry Praschak, a member of the Knights of Columbus, offered to construct a comfort station at the site where the statue was located, adding signs, picnic tables and outdoor grills. In response, the City specifically reserved the area for city park purposes and agreed to build the infrastructure necessary to support a public park. The City also agreed to provide electrical service and to maintain the park. In recognition of Praschak's contribution, the Wildwood Park area was renamed Praschak Wayside Park.

Thirty-nine years later a Marshfield businessman, Clarence Reinders, objected to the presence of the statue on public property. Reinders, a member of the Freedom From Religion Foundation, Inc. ("FFRF"), stated that he avoids using the park because of the statue's presence. In addition, Reinders claimed to take alternate travel routes to avoid viewing the statue of Christ from Highway 13. In March 1998, FFRF asked that the City move the statue to private property. The City did not act on that request, so on April 15, 1998, Reinders and FFRF filed suit in federal court seeking declaratory and injunctive relief.

Soon after the lawsuit was filed, the City erected a disclaimer that states, in part, "[t]he location of this statue ... does not reflect an endorsement of a religious sect or belief by the city of Marshfield." Also,

a newly-formed organization of Marshfield citizens, the Henry Praschak Memorial Fund, Inc. ("Fund"), offered to purchase the statue and the section of the park on which the statue stands. The City accepted the Fund's offer and sold 0.15 acres of land, a portion of which accesses a public road. See Figure C appended to this opinion, infra. The Fund paid the City $21,560 ($3.30 per square foot), which is the highest price per square foot that the City has received for a sale of its land. The bid process met all Wisconsin statutory requirements for the sale of public land. In addition, the City separated the electrical service required to light the statue from the street lighting system that serves the park. The Fund's warranty deed, dated July 2, 1998, includes a covenant running with the land that restricts the use of the parcel to public park purposes.

Following the sale, the parties conducted limited discovery, then both sides moved for summary judgment. On November 5, 1998, the district court issued a memorandum of law denying all parties' motions for summary judgment. The district court found that the sale of land to the Fund rendered moot the plaintiffs' claim that the statues placement in Praschak Wayside Park constituted an endorsement of religion. In addition, the court found that the plaintiffs' alternative claim that the sale itself constituted a government endorsement of religion lacked merit because the sale met all relevant Wisconsin statutes. However, the district court found that there was a question of material fact as to the amount of maintenance and service provided by the City to the Fund's parcel. This maintenance, if proven, could constitute a government endorsement of religion in violation of the Establishment Clause.

In December 1998, the parties stipulated that the City did not provide maintenance or electrical services to the Fund's parcel. On this basis, the district court found that neither the City nor the Fund had taken any action that could constitute a violation of the Establishment Clause and, on these grounds, granted the defendants' motions for summary judgment. Reinders and FFRF appeal, claiming that the district court erred in determining that the sale did not constitute a government endorsement of religion and that the Fund does not create a perceived endorsement of religion by maintaining the statue in a manner that constitutes a traditionally public function.

Presently, the statue remains on Fund property, but this 0.15 acres is not visibly differentiated from the city park. The statue and property are maintained by the Fund, and the Fund pays for the electrical service required to light the statue. The disclaimer erected by the City remains in front of the statue on Fund property.

## I. ANALYSIS

Reinders and FFRF challenge the district court's grant of summary judgment on two grounds. First, they contend that the land sale was a sham transaction undertaken merely to circumvent the "government action" requirement, and as such, the sale itself should constitute "government action." Second, they contend that the district court erred in determining that the sale of land to the Fund ended the government endorsement of religion, because the continued presence of the statue in proximity to a public park may still reasonably be perceived as the City's endorsement of religion.

We review the district court's grant of summary judgment de novo, drawing conclusions of law and fact from the record before us. See Haefling v. United Parcel Serv., 169 F.3d 494, 497 (7th Cir.1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions to file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). In this case, the parties have stipulated that there are no disputes of material fact and summary judgment was appropriate, so we review *de novo* the district court's conclusions of law. *See Central States, Southeast and Southwest Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1322 (7th Cir.1995).

## A. Sale of Land

▪ The Establishment Clause states that "Congress shall make no law respecting the establishment of religion." U.S. Const. amend. I. The Establishment Clause prevents the government from promoting or affiliating with any religious doctrine or organization. *See County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 590, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Gonzales v. North Township*, 4 F.3d 1412, 1417 (7th Cir. 1993). However, "an Establishment Clause violation must be moored in government action of some sort." *Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753, 779, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring). The district court found that the sale of the property from the City to the Fund ended any "government action" endorsing religion, precluding a claim that the City continues to endorse religion. Appellants Reinders and FFRF maintain that this sale was a "sweetheart deal," a sham transaction concocted to circumvent the government action requirement of the Establishment Clause. For this reason, they contend that the sale is conduct that constitutes an endorsement of religion by the City.

▪ The City contends that its sale of the property on which the religious statue stands effectively ends the City's religious expression. Because it is assumed that a property owner controls expression conducted on its property, we impute the views expressed on a property onto it. Thus, "the location of the sign is a significant component of the message it con-

veys." *Capitol Square*, 515 U.S. at 800, 115 S.Ct. 2440 (Stevens, J., dissenting); *see also id.* at 786, 115 S.Ct. 2440 (Souter, J., concurring) ("[A]n unattended display (and any message it conveys) can naturally be viewed as belonging to the owner of the land on which it stands."); *City of Ladue v. Gilleo*, 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("Precisely because of their location, such signs provide information about the identity of the 'speaker.'"). The facial result of the transaction at issue is that the City no longer owns the property where the religious expression occurs. Because we can no longer infer the City's expression from property ownership, the City claims that the sale ended its religious expression and cured any Establishment Clause violation.

▪ Because of the difference in the way we treat private speech and public speech, the determination of whom we should impute speech onto is critical. For there is "a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Educ. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Because of the dramatic difference in treatment of private religious expression and government religious expression, we recognize the effect of formal transfer of legal title to property as a transfer of imputed expression from a public seller onto a private buyer. Absent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion. We are aware, however, that adherence to a formalistic standard invites manipulation. To avoid such manipulation, we look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased.

Reinders and FFRF cite *Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), and contend that we

should disregard the transfer of public property to a private organization in determining whether continued government action exists. In *Evans*, the Supreme Court concluded that trustees for a public park could not enforce discriminatory restrictions contained in the deed because the facts and circumstances of that case led it to conclude that the government was still intimately entangled in the operation of the park. *See id.* at 301, 86 S.Ct. 486. *Evans* was within a line of "public function" cases that found a continuation of state action when a set of unusual facts and circumstances demonstrated that the government remained intimately involved in exclusively public functions that had been delegated to private organizations, *see, e.g., Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (finding state action in the delegation of elective process to private groups); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (finding state action in management and ownership of "company town"), and the Supreme Court has noted that management of a public park is not an exclusively governmental function. *See Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 159 n. 8, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) ("We think that [*Evans v. Newton*] rests on a finding of ordinary state action under extraordinary circumstances."). Therefore, these cases remain relevant only if we find continuing and excessive involvement between the government and private citizens. To determine whether the sale of land from the state to a private organization demonstrates such involvement, we look to a number of factors and determine whether the sale effectively ended state action, based on the totality of the facts in the record. *See Evans*, 382 U.S. at 300, 86 S.Ct. 486. Our independent review of the facts here leads us to conclude that this sale validly extinguished any government endorsement of religion.

The parties stipulate that many of the typical sort of improprieties that might cause us to disregard a transaction do not exist in this case. Even though the City did not solicit alternate bids for the property, the parties agree that the sale of the property complied with the applicable Wisconsin law governing the sale of land by municipalities. *See* Wis. Stat. §§ 27.08(2)(c), 62.23(5), 62.23(17)(b). Therefore, we need not address whether an improper sale ends state action. Because the Fund paid a fair market price for the land, we need not address whether the City has granted a religious organization a gift in the form of a sub-market rate sale price. *Cf. Annunziato v. New Haven Bd. of Aldermen*, 555 F.Supp. 427, 433 (D.Conn.1982) (finding sale of property to a church for $1 constitutes a gift of remainder of fair market value in violation of Establishment Clause). Moreover, in contrast to *Evans*, because the City has ceased maintaining and providing electrical service for the Fund's property, there is no indication that the City is using the Fund merely as a straw purchaser, with the intention of continuing to exercise the duties of ownership. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (distinguishing *Evans* as a situation where "the State has attempted to avoid its constitutional duties by a sham arrangement which attempts to disguise provision of public services as acts of private parties.").

■ Despite uncontested facts demonstrating that the Fund has performed the necessary formalities to effect a transfer of property, paid a fair price and assumed the traditional duties of ownership, Reinders and FFRF argue that the transfer is a sham. They base their argument almost entirely on the restrictive covenant included in the deed of sale, which limits the use of the Fund's property to public park purposes. However, under Wisconsin law, reserving a covenant that will run to one's benefit will not void a land transaction. *See In re Barkhausen*, 142 Wis. 292, 125 N.W. 680, 680 (1910). Therefore, the fact that a covenant exists will not affect the validity of the transfer. The plaintiffs do not contend that the City has made any

effort to enforce this restrictive covenant. Moreover, such action would relate to the conduct of the parties following the sale of property, so at this time, we need not address whether such action would constitute an endorsement of religion in violation of the Establishment Clause. Therefore, we find no extraordinary circumstances that justify disregarding the sale for the purposes of endorsing religion, and we find that the City did not engage in government action endorsing religion by selling the property at issue to a religious organization.

*B. Continuing Endorsement of Religion*

 Reinders and FFRF also contend that a violation of the Establishment Clause persists because the layout of the park and the location and orientation of the statue would cause a reasonable observer to perceive that the statue was still a part of the city park and thus continues to constitute government endorsement of religion. In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established a three-part test to determine whether government action constitutes an endorsement of religion. According to *Lemon*, government action does not violate the Establishment Clause if (1) the action has a secular purpose; (2) the principal or primary effect of the action neither advances nor inhibits religion; and (3) the action does not foster excessive government entanglement with religion. *See id.* Before applying the *Lemon* test, we note that there is no doubt as to the obvious religious message imparted by the statue. On the statue's base in large letters are the words, "Christ Guide Us On Our Way." The City does not contend, nor could it reasonably do so, that the statue serves any secular purpose other than to "beautify" the park. For this reason, we find that the statue serves no secular purpose. *See Gonzales*, 4 F.3d at 1421 (finding that purpose of beautifying public park does not supersede monument's primary religious purpose).

 In addition, the statue violates the Establishment Clause if it has the effect of advancing religion. Following the Court's formal acceptance in *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the effect prong of this test has been analyzed under the "perception of endorsement" test developed in *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Under this test, "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id.* When we find that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*, the Establishment Clause has been violated. *See Capitol Square*, 515 U.S. at 778–79, 115 S.Ct. 2440 (O'Connor, J., concurring); *Gonzales*, 4 F.3d at 1418.

 Before engaging in our traditional endorsement test analysis, we must consider the site of the government's alleged endorsement. Because public fora "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), we restrict the government's ability to limit speech, including religious speech, in such areas absent a compelling state interest. *See Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Doe v. Small*, 964 F.2d 611, 619 (7th Cir.1992). In *Capitol Square*, concern among the justices about potential conflict between Free Exercise and Establishment Clause rights led a plurality of the Court to propose a *per se* rule that the government has not violated the Establishment Clause by providing a pub-

lic forum where religious speech is conducted by purely private parties, so long as the forum is open to all on equal terms. *See Capitol Square*, 515 U.S. at 770, 115 S.Ct. 2440.

However, a majority of justices in *Capitol Square* separately rejected this limited abandonment of the endorsement test because it felt a *per se* test would prove too inflexible for the many fact patterns potentially implicating an endorsement of religion. *See id.* at 787, 115 S.Ct. 2440 (Souter, J., concurring). Justice O'Connor, in a concurrence joined by Justices Breyer and Souter, recalled that "[e]very government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Id.* at 778, 115 S.Ct. 2440, quoting *Lynch*, 465 U.S. at 694, 104 S.Ct. 1355. The varying factual backgrounds of government actions potentially constituting an endorsement require a broad rule that could capture even private speech which reasonably may be understood to constitute a public endorsement of religion. Therefore, these justices applied the traditional endorsement test and found that the expression at issue in *Capitol Square* did not constitute an endorsement of religion. Similarly, Justice Stevens used the endorsement test to reach the conclusion, which he expressed in dissent, that the government action endorsed religion. Justice Ginsburg dissented separately from the judgment, but she did not specify which test she favored. *See Capitol Square*, 515 U.S. at 817, 115 S.Ct. 2440.

Praschak Wayside Park is a city park and a traditional public forum. Therefore, unless we determine that the sale of a section of this park to a private organization has changed the nature of the park, we will apply the tests considered in *Capitol Square* to the facts before us. Despite the sale of park land to a private body, we find that the Fund property constitutes a part of this public forum. We acknowledge that there is no clear precedent on the matter whether private property can

be considered a public forum, *see Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 742, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (refusing to answer broad questions such as "the extent to which private property can be designated a public forum"), but we base our finding on three factors: the historical association of the Fund property with a public forum; the dedication of the property to public use; and the physical location of the 0.15 acre Fund site in relation to the public park and the location and orientation of the statue of Christ within it.

 Whether a property has historically been used for public expression plays an important role in determining if the property will be considered a public forum. *See International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 681, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (refusing to consider bus terminals and train terminals as traditional public fora because of their history of private ownership); *Chicago Acorn v. Metropolitan Pier & Expo. Auth.*, 150 F.3d 695, 699–700 (7th Cir.1998) (concluding that meeting and convention areas are not public fora based on the history of the facility's use). Until the time of the sale, the property now owned by the Fund had been used for public park purposes and was a part of an acknowledged public forum. In addition, the restrictive covenant in the warranty deed dedicated the Fund property to public use, and land dedicated to public use remains a part of a traditional public forum. *See Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (including private property dedicated to public uses within public forum analysis).

Finally, the Fund's 0.15 acre site is not physically differentiated from the surrounding public park, and no visual boundaries currently exist that would inform the reasonable but unknowledgeable observer that the Fund property should be distinguished from the public park. In addition to the fact that no barrier exists between

the City's park and the Fund property, the statue's positioning and orientation combine with the other physical features to convey the impression that the statue is on city park property.[1]

The Fund owns the property on which the statue rests, so the expression made by the statue is now private religious speech. Thus we confront a case, albeit convoluted, of private religious speech made at a traditional public forum, where the analysis of *Capitol Square* applies. Under *Capitol Square*, when private religious expression is made at a traditional public forum, the government's condonation of such expression may be government action endorsing religion, even if the government makes no overt act in furtherance of religion. *See Capitol Square*, 515 U.S. at 787, 115 S.Ct. 2440 (Souter, J., concurring) ("*Allegheny's* endorsement test cannot be dismissed ... as applying only to situations in which there is an allegation that the Establishment Clause has been violated through 'expression by the government itself' or 'government action ... discriminat[ing] in favor of private religious expression.' "). According to the *per se* rule advocated by the plurality in *Capitol Square*, to find a violation of the Establishment Clause we must determine either that the speaker is not a purely private person or that the forum is not open equally. *See Capitol Square*, 515 U.S. at 770, 115 S.Ct. 2440. Under the endorsement test, we look to the unique facts and circumstances before us to determine whether a reasonable person would perceive the existence of the statue to promote or disfavor religion or a particular religious belief. *See id.* at 778, 115 S.Ct. 2440.

Taking into account the unique facts and circumstances as they would affect the reasonable person, we find that the presence of the statue would create the perception of government endorsement in a reason-able observer. In *Capitol Square*, Justice O'Connor explained that in a traditional public forum a reasonable observer would be aware that "a multiplicity of groups, both secular and religious, engage in expressive conduct." *Id.* at 782, 115 S.Ct. 2440. In this regard, the history of Praschak Wayside Park differs dramatically from other public fora. Since its creation in 1964, the park has expressed only one message, which is the religious message conveyed by the statue. The park was created to display the statue, and the City presents no evidence that other groups have ever used the park to present alternative messages. For this reason, a reasonable observer familiar with the history of the park would have no reason to be aware of non-sectarian reasons for the government's endorsement of religion. The current physical state of the park also leads a reasonable person to conclude that the statue is a part of the public park and that the government, rather than a private entity, endorses religion. As we have noted, Fund land is visually indistinguishable from City land, especially when viewed from Highway 13.

Finally, we are mindful that secular circumstances may serve to neutralize the religious message of an unattended monument. *See Gonzales*, 4 F.3d at 1422. The City argues that the duration of the statue's stay in the park has made it a non-sectarian landmark. However, we rejected this argument in similar circumstances in *Gonzales*, noting that such an argument "smacks of bootstrapping," *id.*, because it would allow a violation of the Establishment Clause to become permissible merely by remaining in violation of the clause without complaint. In addition, the disclaimer is insufficient as currently constructed to dispel this perception. For these reasons, we believe that a reasonable observer, without regard to a reasonable observer's degree of understanding,[2] would

1. To complicate matters further, although the City has erected a disclaimer, it is placed on Fund property, increasing the risk of confusion over whether it still controls this land.

2. We allude to the unresolved dispute which

perceive the statue to constitute a City endorsement of religion.

We find that, even under the more permissive per se rule endorsed by the plurality in *Capitol Square*, the present layout of the park invites a perception of a government endorsement of religion. The sale transferred the statue from City ownership to private ownership, and the Fund, a purely private entity, is responsible for any expression inferred from the statue. Had the sale of the property been conducted in such a manner as to remove the impression that the statue remained part of the public forum, there would be no question that the city ended its Establishment Clause troubles. Nonetheless, because the park is a traditional public forum, the park must remain "open to all on equal terms," *Capitol Square*, 515 U.S. at 770, 115 S.Ct. 2440, under the *Capitol Square per se* rule to avoid an Establishment Clause violation. In his plurality opinion, Justice Scalia noted that "giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter)" would violate both the Establishment Clause and the Free Exercise Clause, because by so doing, the government exercises favoritism of one sect or religion over another based on the content of the expression. *See id.* at 766, 115 S.Ct. 2440. In this case, the statue, which serves no secular purpose and portrays a figure of particular importance to one religious group, undisputedly expresses a sectarian religious message ("Christ Guide Us On Our Way").

Although the sale of the land to the Fund ended any direct government action that would constitute endorsement, the sale has given this sectarian message preferential access to Praschak Wayside Park, a public forum. The statue is an unattended object fifteen feet in height and made of marble. For this reason alone, citizens who wish to endorse other religions or sects on "equal terms" would find it exceedingly difficult to erect an object of equal expressive power or to maintain it on government property. In addition, the sale of a parcel of land where the statue permanently resides, previously within the bounds of the park, provides the Fund with a preferential location from which they may express their message. In contrast with *Doe v. Small*, 964 F.2d 611 (7th Cir.1992), where all private parties were all allowed to make protected expression on the same terms, the Fund cannot be compelled to limit its expression in the way that another group wishing to express itself in the park could. For these reasons, we find that by failing to distinguish the Fund's land from the remainder of the park, the City has granted the Fund preferential access to a public forum, which violates the Establishment Clause. Thus, under either the traditional reasonable perception test or the *per se* test advocated in *Capitol Square*, we find that the proximity of the statue to City property and the lack of visual definition between City and Fund property creates a perception of improper endorsement of religion by the City and constitutes a violation of the Establishment Clause.

exists within various circuits and within the Supreme Court as to the proper level of understanding to impute onto our mythical reasonable observer. *Compare Capitol Square*, 515 U.S. at 778–79, 115 S.Ct. 2440 (O'Connor, J., concurring) (favoring reasonable person who is "a personification of a community ideal of reasonable behavior") *with Capitol Square*, 515 U.S. at 799, 115 S.Ct. 2440 (Stevens, J., dissenting) (arguing that any reasonable person who "could perceive a government endorsement of religion" is a reasonable observer); *see also Doe v. Small*, 964 F.2d at 629–30 (Easterbrook, J., concurring) (noting that an "obtuse" observer cannot force religious speech to be excluded from public forums); *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538, 1543–44, 1557–58 (6th Cir.1992) (Lively, J., dissenting) (disputing proper degree of local knowledge to impute on reasonable observer). Because we find that even a reasonable observer under these circumstances would perceive endorsement of religion, we need not determine the exact degree of knowledge to apply to a reasonable observer.

## C. Remedy

The City argues that it no longer commits any government action and cannot be in violation of the Establishment Clause because it has sold the statue. However, "[t]he Clause is more than a narrow prohibition against certain narrowly defined forms of government favoritism . . . it also imposes affirmative obligations that may require a state, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message." *Capitol Square*, 515 U.S. at 777, 115 S.Ct. 2440 (O'Connor, J., concurring) (citation omitted). Nonetheless, we believe that this perceived endorsement of religion can be alleviated without recourse to removal of the statue from Fund-owned property.

On remand the district court may explore, in concert with the parties, how to remedy the existing Establishment Clause violation. We note, however, that because our holding limits private speech in a public forum, any remedy must be narrowly tailored to avoid an Establishment Clause violation. *See Doe v. Small*, 964 F.2d at 620. Because the government may not view private religious speech to be inappropriate merely because of its content, the only redressable harm that the City must correct is the perception that it has endorsed the speech. *See id.* Therefore, either the Fund, a private land owner, must be estopped from exercising its right to free exercise and freedom of speech on

its own property, or some way must be found to differentiate between property owned by the Fund and property owned by the City. The latter—not the former—is the appropriate solution.

The inability to distinguish between City park and Fund property affects both the Fund-owned property's status as a public forum and the perceived endorsement of religion. Therefore, should the City (on City property) construct some defining structure, such as a permanent gated fence or wall, to separate City property from Fund property accompanied by a clearly visible disclaimer, on City property,[3] we doubt that a reasonable person would confuse speech made on Fund property with expressive endorsement made by the City.

## II. CONCLUSION

We find that the sale by the City to the Fund did not constitute government action in violation of the Establishment Clause. However, because the sale does not relieve the continued perception of government endorsement and grants the Fund preferential access to express its views in Praschak Wayside Park, we find that the current visual condition of the park constitutes a continuing violation of the Establishment Clause. For this reason, we VACATE the summary judgment issued in favor of the City and the Fund and REMAND this case to the district court for further consideration in light of this opinion.

---

3. In *Capitol Square*, Justice O'Connor also suggested that a sign or disclaimer would also prove helpful in a public forum to "make the State's role clear to the community." *Capitol Square*, 515 U.S. at 776, 115 S.Ct. 2440 (O'Connor, J., concurring). We agree that a disclaimer still would be helpful to make clear

the City's disavowal of any endorsement of religion. However, unless the disclaimer currently resting on Fund property is moved or replaced with one on Fund property, its presence creates the very impression that the disclaimer seeks to dispel.